for the petitioner ruled in in this matter. This case really just has one issue, and that is whether a person who resists a gynecological examination under the Chinese family planning policy fits in to the qualification of a refugee. And under this, under the IRA Act of 1996, the court has recognized this as language that contains other resistance. And I would argue to the court today that this refusal of a gynecological checkup does fit into that definition, Your Honor. But it requires that someone be persecuted for the resistance. Let's focus on that. The one thing, clearly, if she were forced to undergo an abortion or a sterilization, I don't think there's any doubt about that, that would be persecution. As we move away from that to something on the extreme opposite end of the scale of annual gynecological examinations, I'm not saying that's the case, but to set up a continuum, when we move from, say, an annual gynecological exam done in a medically acceptable manner in a medically appropriate place, down the road toward involuntary sterilization, at some point, we cross the line and we get into persecution. Now, help me to understand why the record would show that she's on the persecutorial side of that continuum, as opposed to the non-persecutorial side of that continuum. Well, Your Honor, first I would say it would be regarding the wording of this. Because we're referring to her as a gynecological checkup in this matter. However, this was a woman who had lived 22 years all the time. She's not consenting to this, Your Honor. And I believe if you take that consent out of that, this makes this from a checkup to maybe a type of a sexual assault for a woman who does not want her private parts touched in what she feels is an inappropriate matter, which she does not agree to under this policy. So, that's what I would state first, and I believe this checkup is an invasive procedure to her, and she feels that way. And I would also state, I believe Your Honor is right, this does not meet the standard, not meet the heights of an abortion or a sterilization. However, this court has recognized in Cal v. Gonzalez that a person who wrote letters about infanticide in the hospital met the definition of other resistance. And I would argue, I believe that this is a person who has actually faced this physical herself. Yeah, but see, the issue is not resistance. Maybe that case helps with resistance. The issue is not resistance, but the persecution, the response to the resistance. But one is that she's resisting, and whether or not that rises to the level of persecution. And that's a tougher and closer question, it seems to me. Well, as I was stating, Your Honor, I believe it does rise to that level of persecution, because she does not want a person touching her body in private areas, examining her four times a year. Is there a difference between the act itself and the person's reaction to the act? That is, if there were a woman in the same situation as your client who would be willing to permit an examination but would still find it to be entirely inappropriate, to be treated the same way as a woman who would find it very violative and react and perhaps would be willing to resist, do we look at those cases in exactly the same way, or is your situation more serious? And if so, why and why? When I'm looking at the definitions here, I'm trying to figure out what the coercive act is and the extent to which it depends on the reaction of the person who's being coerced. Or does it make any difference in your view? Your Honor, I would state that in her case, I think the family planning authority's acts of just constantly coming for her, whether it be at home or at work, shows the seriousness of this as well. And you're right, Your Honor, it could be a fine line in this matter. And, you know, just from experience as a practitioner, a Chinese person's definition of persecution isn't always the same. For instance, if you ask a person if they're persecuted, they may say no, but if you ask, were you given a forcible abortion, they'll say yes. They might not consider that the same way. And what I'm saying is she does consider this. She stated that she considers this a human rights violation. And while I can't argue for all the rest, I believe in her case, she would fit that definition, Your Honor. And she was found credible in her beliefs by the immigration judge in this matter. But tell us what the immigration judge said and why he found it insufficient. He found it insufficient, well, because the Third Circuit hadn't stated yet that someone in this exact factual situation would meet other resistance. He also said that he felt granting, adding it in his definition would be opening the floodgates, which might have been what Your Honor was citing to everyone who just felt that way. And I would disagree with that. And I would disagree with that based on in determining whether to open the floodgates, you have to determine if there's a flood in the first place or if there's one coming in the future. And from all the cases I've researched on this other resistance, all the courts have said there's very little in this area, which indicates to me there aren't a lot of people claiming other resistance or the people who may have had the gynecological examination were also later forcibly aborted or sterilized. And regarding the future, regarding if anything would be in the future floodgate issue, Your Honor, I would state the Second Circuit recently ruled on the foreign-born children that just having two children here could be something that would qualify, even if there was nothing in China before. And, you know, that would mean a person could come in and just have children to qualify. And to me that, I haven't seen anything from the Second Circuit that that's opened the floodgates as well. And I think in determining that, I think in this court's decision in Chen, the court noted that Congress did not specifically write what persecution was other than its normal meaning for the courts to determine, you know, as time goes on, things may change to what may be persecution. And I believe in this matter, this forcible, what I believe is a type of sexual assault does qualify as other resistance in this matter. And I would also state to the court as well that the Ninth Circuit has found that in Lee v. Ashcroft that this is other resistance, where the court found that the forced pregnancy examination constituted persecution on account of political opinion to China's coercive family planning policy. And the Ninth Circuit has regarded this whole Chinese family planning policy in a whole, which not all other courts have agreed to do. You know, as a whole, what I mean is that, you know, the age restrictions are part of the family planning policy. Whether a person where the Chinese government does not allow someone to marry due to that age where they can't fit on the matter of CYZ, that's also a matter under the family planning policy as well. And that would not preclude someone from, you know, standing in the shoes of their wives or their loved ones in those matters, Your Honor. And that's the context I believe the court should be accepting in this matter, that this gynecological checkup is part of the family planning policy of China. And under that policy, she is forced to go to this examination against her will. Good. So on the continuum of invasive procedures that Judge McKee talked about at the beginning, your position would be that the threat of having to undergo a gynecological examination should be sufficient to constitute well-founded fear of future persecution. Correct? That is correct, Your Honor. And you mentioned the Ninth Circuit case and some of the other cases that described the facts where women felt that they had been treated in a way that they had almost been raped and described their reactions. Now, does that factor in to our determination as well, or does there have to be… I go back to a question I asked earlier. Does the woman's reaction count on this, or is it simply the act of doing the examination or the threatened act of doing the examination sufficient to constitute a well-founded fear of persecution? Your Honor, to answer your question, I believe this examination, if a person is forced to do it, would qualify for that because they are all getting the examination and maybe their reaction may determine the seriousness of this. You know, if the Chinese government feels that their adverse reaction was more of a political opinion, but I feel that this is violating the person's rights under this family planning policy, which this person does not agree to, and I believe that due to that, it would fit the definition. And, you know, while I would, you know, that this could apply to a lot of people in China, but the fact that it could apply to a lot of people in China should not impact the court's decision because if the court feels she truly does not feel she meets the definition, she should not be left out. I guess it would be akin to, you know, everyone said we don't want to open the floodgates, but the floodgates should be open for people who meet the definition and are innocent and deserve to be saved before they drown. And I feel she fits into that area, Your Honor. And I feel other Chinese people as well. And due to that, I feel she definitely would be persecuted in China under this policy and she would have a future fear of persecution because if she goes back to China, they still want to do the same. Do you want to save your time for rebuttal? Yes, Your Honor. We'll add another minute or two. Okay, thank you. Thanks very much, Mr. O. Good afternoon, Your Honor. May it please the court, my name is Katie Newton and I represent the United States Attorney General in this case. As Judge McKay has already stated, what the statute requires for someone to have refugee status is persecution. And in this particular case, what we are talking about is was Ruilin, was she persecuted for other opposition to the Chinese family population control policy? Or does she have a well-founded fear of future persecution? That's correct, Your Honor. That's the other prong. It's either was she persecuted in the past or does she have a well-founded fear of that persecution in the future? The answer to that question is no. And the reason for that is although, as this court is well aware, we have not addressed this particular issue here, the court has talked about the fact that persecution is an extreme concept. And it does not encompass all treatment that we might find unjust, unfair, or even unconstitutional. Why wouldn't forced invasion of one's body be that extreme enough? Your Honor, up to this point, no one, no circuit court that has addressed the issue simply of an examination without more. And this is even less. This is simply a request for the examination. No circuit court has found that just the examination is enough for persecution. Now my colleague talked about the Lee case out of the Ninth Circuit. In that case, the petitioner had announced her opposition to the family planning policy, was taken forcibly to the examination, was forcibly restrained during the examination, and then she was threatened afterwards that she could be examined again and she could be forced to be sterilized or to have an abortion. Taking all those facts together, the Ninth Circuit found that, yes, that was persecution. Let's take out the last two factors, the threat of sterilization or abortion. Why are the other factors legally significant? The other factors about the forcibly restrained, Your Honor?  Well, the court, of course, has defined persecution as involving threats to one's life and threats to one's liberty. And as Your Honor mentioned, this is a continuum, and I think this is a tough area to get into on exactly where we go with the continuum. I don't know if the Ninth Circuit would have found, without the other factors there, that that would have been persecution, given the fact that it is such a high standard to meet that. Other circuits have not found that. The Fourth Circuit, for example, found that the insertion of an IUD was not persecution. The Eighth Circuit found that someone going to an examination that they did not want, saying they hated the family planning policy, then refusing to go to a second examination and then fleeing, coming here, that did not qualify as persecution. Now, the Second Circuit has ruled on this several times. All of those opinions are unpublished and they're non-precedential. But in the three cases that I'm aware of, just since, I believe, March of 2005, the Second Circuit has found requests for an examination, or the examination itself, or the family planning officials taking someone to a mandated examination, none of these things will qualify as persecution under the terms of the statute. One of the concerns here, as this Court, in a non-precedential opinion in Lee last year, talked about is, if what you're looking at here is a well-founded fear, the only well-founded fear that Ru Lin has at this point, as she herself stated, I could have to go back to China and I could have to have the examination. If that's the standard, any single woman in China of child-bearing age who could then be eligible for asylum simply by saying, I'm afraid I would have to have that examination. And that simply is not enough to qualify with this extreme concept of persecution. Now, how far we go in looking at coercion? Your Honor, I have a question. No, no, no. Go ahead. How far we go in looking at what this coercion is, is going to be fact-specific. We cannot speculate or hypothesize on, well, if we had a situation where someone was taken by the family planning officials, the Second Circuit has said, that's not enough by itself, taking someone for the examination. The Eighth Circuit and the Second Circuit have said, and the Fourth Circuit, inserting an IUD, even if someone doesn't want it in China, however distasteful, we may find that. And there's no question that it is. But again, it's not enough for persecution. The Ninth Circuit is the only circuit, as well as the Eighth, that has said when someone is forcibly restrained, when they are being threatened, and in the Eighth Circuit case, the Yang case, when someone had a forced injection, was forced to have an IUD twice and was not allowed to remove it, that then rises to the level of persecution. But there's several steps and several things that are happening to that woman at that point before we get to a level where we're going to take it to that extreme. She has a well-founded fear of that result if she goes back. Even assuming in the past that hasn't happened, she's concerned if she goes back and doesn't consent, she could well be concerned that they're going to give her this examination. If she doesn't consent, there's only one way you can give her the examination. If she doesn't consent, either anesthetize her or forcibly hold her down and exam her. Your Honor, the only thing the record shows in this case is that the petitioner herself said that the family planning officials came almost every day to her home, to her work, and asked her to take the examination. They never forcibly took her. Now, she then left. She went to another city. She was there for three months and then was told she had to get a residence permit and she needed to get the examination. And she was fired from that job. She goes back home and then she comes to the United States. So, there's no indication in this record with this young woman that anyone was going to forcibly take her for that examination at all. And we can't speculate, given the record that we have, if that would have happened. Even in that case, if she was taken for the examination, and that's all that happened, don't believe that that itself would rise to the level of persecution under the standards that not only other circuits have set, but that this circuit has set in different contexts. What we have here is a young woman who was asked to have an exam. That's the only facts that we know. She was asked repeatedly, but that's all that happened. She then fled the country and she is claiming that her only fear of persecution is that if she is sent back, she will have to have that examination. She's expressed no other fear other than that in this particular case. Because of that, we can't say that the evidence is so compelling in this case that no reasonable fact finder could find anything other than that she, one, experienced past persecution, as she has claimed by the repeated request for the examination, or that she has a well-founded fear of persecution, being asked again if she goes back to China for that examination. Was the IJ's finding in the nature, or conclusion, in the nature of a fact finding or in the nature of a legal conclusion? To the extent that no one under these circumstances can ever qualify. I don't believe that the IJ, certainly under the facts presented, the IJ, I believe, would state that no, under these facts, she does not qualify, and no one else under these particular facts, just with the request being made, would qualify. But I don't believe that the IJ gave an opinion that in no situation involving any type of gynecological exam or procedure, that in that particular case, persecution could not be found. The IJ found her credible, but the IJ found that simply the fact that repeated requests were made for her to have the examination, that did not rise to a level of persecution. It's the government's view that this should be viewed under the substantial evidence test, that the only way the court can reverse is if the evidence is so compelling that no reasonable fact finder could not have found that she was not being persecuted in this situation. Given the facts that are not in dispute between the parties here, that simply is not the case. What kind of deference do we owe in this case where the BIA has not given a direct opinion? Your Honor, in this case where the BIA has affirmed the opinion of the IJ, the court reviews directly the opinion of the immigration judge, and that is under the substantial evidence test. I understand that, but is there... If in fact we are looking at an interpretation by the IJ of what might be an ambiguous statute, do we review in the same way where the BIA has not yet made a determination? Your Honor, if we're looking at this as an interpretation of a statute and therefore under Chevron deference, of course this court has said that you're going to allow the agency to interpret the statute and affirm that interpretation unless it is contrary to law, it is capricious, or it is arbitrary. Now the BIA, by affirming the IJ's opinion, our position would be that this court should then look at the IJ's interpretation in that same way, since it was affirmed. The BIA also has, of course in cases across the country, held the same interpretation. For example, in the 8th Circuit in the Hwang case, in the 2nd Circuit unpublished cases, in the 4th Circuit case as well. So you're saying they've already made this determination in other cases? Yes, Your Honor, that's correct. The BIA has certainly, through their affirmance of the IJ's decision in other cases. But have they written anything on this? I am not aware if the BIA itself has written an opinion on this. Should they? Your Honor, in this case, no, I don't believe that that's necessary. Because given, again, the record in this case, and what the statute says, and this court's recognition about what persecution is, that this is not a matter for interpretation, this is simply taking these facts, that the IJ certainly has substantial evidence to conclude on these particular facts, that there was not persecution and Ru Lin is not a refugee under the terms of the statute. Your Honor, does the court have any other questions? Again, Ms. Lin cannot point to any record evidence that compels this court to conclude that she suffered past persecution, or that she has a well-founded fear of persecution as a result of the request to go for a gynecological examination. We therefore ask that the petition for review be denied. Any questions? No? Good. Thank you, Your Honor. Thank you very much, Ms. Lin. Good. Mr. Offit. So let me ask you, I didn't think about this before, I can't tell you how I came to this, but until I heard Ms. Newman's argument, it hadn't occurred to me. What we have here on this record is a woman who is not saying that I want to have a family, and if I'm sent back because of China's coercive family planning policy, I can't have a family. What she is saying is that she doesn't want to be subjected to a gynecological examination. So I could see in my mind someone saying, I don't ever plan to have any children. That's not what this is about. I simply don't want to have some stranger looking around inside of me. It's none of their business. It's my body, not theirs. I'm not going to let them examine me, period. That's got nothing to do with my family planning. If you really ask me, no, I don't want to have any children. My boyfriend is impotent since that's what's triggering these exams. What then? Would that be coercive, her refusal to take an exam, to submit to an exam, would that still be the kind of concern Congress had when they amended the statute? She says, I'm never going to have children. My boyfriend can't have any children anyhow. He's impotent. But I don't want to submit to this, what I assume is a very intrusive, what I consider a very intrusive examination. How would that be something that would fall under this asylum claim? Well, it just falls under the term other resistance. And Congress put it in there. Resistance to what? Resistance to the family planning policy part where you don't want anyone. The Coercive Population Control Program. She could be saying, I don't care anything about the Coercive Population Control Program. That's not what this is about. This is about, it's my body. No one's going to examine me unless I consent to it. Now, that may not be exactly what this record is, but that's not inconsistent with this record either. No, it's not, Your Honor. It goes both ways. She did say she wanted to marry her boyfriend in this case eventually. They don't care if she marries him. They're concerned about what happens after that. Well, there may be an after-marriage issue as well, but before the marriage part, Your Honor, I believe this is what Congress did intend that the whole policy, which is for non-married women who may face an abortion because they're not married, or women who are not married and just don't want to do the gynecological checkup, would fall in under this policy, Your Honor. I don't believe what a person's determination to whether she wants a family or not would change it. What if she wasn't fertile? I get the last word. What if she wasn't fertile and she objected to having a gynecological exam? I believe the same one. She does not want someone going into her body. She feels this is a violation of human rights. She does not consent to this. And I think... Again, it wouldn't be a Population Control Program. It would be a personal feeling that she had, a very understandable objection to a policy which she would find obnoxious and repugnant, and she wasn't willing to voluntarily submit to it. So that doesn't make it a voluntary... That does not make it a Population Control Program. That makes it an issue of bodily integrity. Well, the Chinese government would perceive it as a Population Control Problem. The letter says she's not fertile. She can't have any kids. I truthfully don't want to speak off the record. I don't know what the Chinese government does regarding fertility issues with people, Your Honor. But to me, it could be imputed to her that she's resisting the policy because they are still treating her just like everyone else under this policy. And just one last thing that you said in Congress, Your Honor, is regarding the court's decision in this area, one of the reasons why they said Congress did not want to expand the definition was Iowa is first capped at 1,000 people per year. And I don't believe that's a correlation. Recently, the Real ID Act helped remove the cap. And it was argued before that the reason they had the cap was to lower it. It could be argued now that they've removed it. Maybe they want more in that matter. And I believe that if she's fitting the definition, I think all these, the arguments regarding intent, which the immigration judge never, which was a legal thing by the immigration judge to say, he just didn't want to overrule people above him, especially when the BIA and the courts haven't spoken in this matter, Your Honor. That's all. Unless you have any questions. Any other questions? No, Mr. Rottman, thank you very much. The case was well argued. We will take the matter under advisement. John, do you have a telephone number we can call you? All right, we'll call you in Chambers then. Very good. Very good, thanks.